THE ST. LOUIS & SAN FRANCISCO RAILROAD COMPANY V. SARAH E. JOHNSON.

No. 14,622.   (86 Pac. 156.)

SYLLABUS BY THE COURT.

1. EVIDENCE—*Presumption as to Common Law of Another Jurisdiction.*   In the absence of evidence to the contrary this court will assume the common law of the Indian Territory to be the same as the common law in force in Kansas.

2. RAILROADS—*Injury to Employee—Pleading and Proof.*   In an action against a railroad company to recover for the death of a brakeman which occurred in the Indian Territory, the petition alleged that the laws of that territory in respect to the cause of action surviving, and in reference to descents and distributions, are substantially the same as the laws of Kansas; that plaintiff was entitled to maintain the action in the courts of that territory; and that the courts there would, in such a case, hold her entitled to recover.   *Held,* that the

last averment being a conclusion of law, it was not necessary for plaintiff to offer proof of what the courts of the Indian Territory would hold in such a case; that upon proof that the action could be maintained in the courts there, and further testimony in the case tending to prove that the proximate cause of the death was the failure of the railroad company to use reasonable diligence to provide reasonably safe appliances for the use of its employees, it became wholly immaterial what was the common law in force in the Indian Territory at the time in respect to fellow servants, and that in such a case it will be assumed that the holding of the courts there would be the same as that of the courts here.

3. —— *Defective Appliance—Inspection—Inference by Jury.* Where the grab-iron on the end of a box car is found in a dangerously defective condition, in being mashed flat against the end of the car, and there is evidence tending to show that the defective condition existed when the car was placed in the train and that a slight inspection would have disclosed its condition, the jury may infer, when no inspection is shown to have been made, that the car was not inspected before it was placed in the train.

4. INSTRUCTIONS—*Contributory Negligence—Burden of Proof.* An instruction which states that the burden of proof is upon defendant to establish the defense of contributory negligence is not open to the objection that the jury might have been misled when none of the evidence of plaintiff tends to prove contributory negligence.

5. JURY AND JURORS—*Argument—Waiver.* The party on whom rests the burden of proof has the right to open and close the argument; he may waive the opening or the closing, or both. By waiving the opening he waives the right to close, provided the other party also waives argument. If the other party proceeds to argue the case to the jury, the one who has the burden of the issue is entitled to reply to such argument.

Error from Johnson district court; WINFIELD H. SHELDON, judge. Opinion filed June 9, 1906. Affirmed.

### STATEMENT.

SARAH E. JOHNSON brought an action against the plaintiff in error to recover for the death of her son, William A. Johnson, a brakeman, who was killed while in the employ of the railroad company near Scullin, in the Indian Territory. She recovered a verdict and

Railroad Co. v. Johnson.

judgment for $2000, and the company prosecutes this proceeding in error.

William A. Johnson was thirty-six years of age at the time of his death, and unmarried. He had for a number of years been the chief support of his mother, the defendant in error, who was a widow aged sixty-five years. This was his first trip in the employ of the plaintiff in error, although he had had twelve years' experience as a brakeman. He was head brakeman of a freight-train made up at Sapulpa, I. T., on the 6th of November, 1902, which left that point at about four o'clock in the afternoon for Sherman, Tex. The train was composed of about twenty box cars, flat cars and coal-cars (some loaded and some empty), an engine and a caboose. The train crew consisted of the conductor, who had sole charge of the train, the head and rear brakemen, the engineer, and the fireman. The deceased had nothing to do with making up the train at Sapulpa. About midway of the train was a "Frisco" box car (No. 7706), and next to it on the south was a flat car loaded with steel rails. At Sapulpa, where the train was made up, and at Francis the plaintiff in error had inspectors and repair-shops, where light repairs were made.

The deceased started from the caboose about two o'clock in the morning of November 7 in the performance of his duties, which required him to pass over the tops of the cars to reach the head of the train. He was last seen by Roy Gardner, the rear brakeman, who was in the cupola of the caboose and who was the principal witness for the plaintiff. Gardner testified that he was watching deceased, and that when the latter reached a point about where box car No. 7706 was witness saw a light, supposed to be the lantern carried by Johnson, suddenly disappear down to the ground on the right side of the train, as it was going south, just below the station of Scullin. At the next station Johnson was missing, and the conductor inquired of the witness about him and both looked for him. Gardner then told

the conductor that Johnson would be found about a mile and a half south of Scullin, near a certain bridge. The conductor procured an extra engine and went back and found the body, badly mangled, and lying in the center of the track at the place where Gardner saw the lantern fall. The flanges of the wheels and the brake-beams on the west side of car No. 7706 showed the blood marks, while there were no marks on those on the east side.

The petition set up a number of negligent acts on the part of the railroad company, the chief of which was that car No. 7706 was in a defective and dangerous condition because the grab-iron or handhold at the top of the car on the right-hand corner of the forward, or south, end was missing, and the foot-rest or grab-iron on the end of this car near the bottom was mashed in flat against the end of the car, so that a brakeman could not in the night-time find a place for his feet to rest while swinging around from the side ladder to the end of the car so as to reach the flat car, which was lower; and in putting such defective and dangerous car into the train for the use of brakemen and permitting it to remain in the train in such condition; also in failing reasonably and properly to inspect such car at Sapulpa before it was put in the train, and at other stations along the line of plaintiff in error's road; in failing to provide sufficient inspectors at such stations, and in the failure to warn the deceased of the defective and dangerous condition of the car, or to have it marked as a bad-order car.

Car No. 7706, like all other box cars, was provided with handholds and grab-irons. These words are used interchangeably, but, strictly speaking, handholds are on the side or top of a car and grab-irons are on the ends. They are made of an ordinary piece of iron rod, about half an inch thick, about a foot long, turned down at the ends, and bolted or screwed onto the car. They are located at the right- and left-hand corners of the car (diagonally), facing in the direction the car is go-

Railroad Co. v. Johnson.

ing.   The ones on top of car No. 7706, going south in the train as it was at the time of the accident, were, or should have been, at the southwest and northeast corners, respectively.   The top handhold at the southwest corner of the car, which was missing, should have been about six inches from the south end of the car and from eight to sixteen inches from the west side.   This was to enable one to get down from the top of the car to the side, or *vice versa*.   On the west side, at the southwest corner, there was a ladder which consisted of five or six handholds about fifteen inches apart.   The grab-iron at the southwest corner was on the south end of the car, about a foot from the bottom of the car, and the same distance, perhaps, east from the corner and about six feet from the top.   A person getting down from the top of the car, therefore, was not supposed to go over the end of the car, but down on the side and then around the end of the car.   The handhold at the northeast corner of this car was also gone, and the brake-staff at the south end was badly bent; but, except as showing the general condition of the car, these defects are not important, for the reason that the deceased would, in the ordinary course, have used the ladder at the southwest corner and the foot-rest on the end of the car to reach the flat car ahead.

It was the theory of the plaintiff that Johnson attempted to descend by the ladder or grab-irons of the box car at this corner, and to swing himself around to the end of the car to place his feet on the grab-iron or foot-hold, and that, the only foot-rest being mashed flat against the woodwork of the car, the weight of his body carried him down and between the cars.   The fact that the blood marks were all found on the gearing on that side of this and the following cars in the train tended to support this theory.   There was also some evidence of the trainmen that the paint on the end of this box car showed shoe marks, or scratches, indicating an attempt by some person to find a resting place for the feet near where the foot-rest should have been.

The defective condition of this car was repaired by the railroad company immediately on its arrival at Sherman, Tex. The evidence established that the deceased was an intelligent, sober and capable brakeman.

*L. F. Parker,* and *Pratt, Dana & Black,* for plaintiff in error.

*A. Smith Devenney,* for defendant in error.

The opinion of the court was delivered by

PORTER, J.: The jury made over seventy special findings, among them the following:

"(17) Ques. When said box car 7706 was put in that train, and at the time the deceased lost his life, was, or was not, one of the grab-irons or foot-rests of the ladder on the south end of said box car 7706 mashed flat against the wood of the car so that it could not be safely used by the deceased as a handhold or as a foot-rest? Ans. Yes."

"(21) Q. Did the deceased attempt to get from the top of said box car 7706, in the exercise of ordinary care, when [the train was] in motion, in an effort to reach his post of duty at the head end of the train near Scullin or Mill Creek station, at about two o'clock in the morning of the 7th day of November, 1902, or did he not? A. Yes; he did.

"(22) Q. If you answer 'yes,' then state if he did so in the customary manner and by the proper method in vogue by head-end trainmen under similar circumstances? A. Yes."

"(24) Q. If you answer question 16 'it was,' then state would the deceased have lost his life if said grab-iron, or foot-rest, on the south side of said box car 7706 had not then been mashed flat against the said end of said box car, in all reasonable probability? A. No."

"(26) Q. At the time of the death of said William A. Johnson, was or was not the rung or foot-rest of the ladder of said box car 7706, on the south end of said box car, in a defective and unsafe condition for the trainmen to use or handle in the night-time in the discharge of their duty, in the exercise of ordinary care, and train in fast motion? A. Yes.

"(27) Q. If you answer 'yes,' then state if said con-

dition could have been discovered by reasonably thorough or proper inspection, either before said box car 7706 was put in that train for transportation or when en route and before the death of said William A. Johnson?  A.  Yes."

"(31)  Q.  Was or was not the top of the load upon said flat car (next to said box car) lower than the said grab-iron, or foot-rest, which was mashed flat against said end of said box car 7706?  A.  Yes; lower."

"(35)  Q.  If you answer 'yes,' then state if he fell from the grab-iron on the south end of said box car 7706 to the ground between the end of said box car and the end of said flat car, near the southwest corner of same, thence down to the ballast and between the rails?  A.  Yes."

"(41)  Q.  Was or was not said box car and its several appliances complained of, and each of them reasonably, properly and timely inspected by the defendant at Sapulpa, I. T., before said car was put in that train for transportation in and for the trainmen to handle in the exercise of ordinary care?  A.  No, it was not.

"(42)  Q.  If you answer the last question 'no,' then state if that was a contributive proximate cause of the injuries to and death of said William A. Johnson. A.  Yes."

"(56)  Q.  If you find and believe from the evidence that said appliances and car 7706 were defective and dangerous to use, then and there, and that the defects were of such a nature that in the exercise of ordinary care, by reasonable and proper and timely inspection or otherwise by the defendant company, they could have been discovered, then state if the defendant should have discovered all same, before the injuries to, and death of, the said William A. Johnson, in the exercise of reasonable diligence.  A.  Yes."

The principal contention of the plaintiff in error is that the defendant in error was not entitled to recover because she failed to show by evidence what the courts of the Indian Territory would hold in such a case.  In her petition she pleaded the laws of the Indian Territory, and on the trial introduced in evidence the act of congress of May 2, 1890, putting in force and effect in that territory certain chapters of Mansfield's digest

of the statutes of Arkansas, and also offered in evidence those sections of the Arkansas statutes which provide for maintaining an action for wrongful death and in reference to descents and distributions. In her petition there was also an averment as follows:

"Plaintiff further avers and states that, under ·the law in force and effect at the time and place of the death of said William A. Johnson, and still is in full force and effect (where his death and injuries occurred), in and of the Indian Territory, the same being of similar import and character as the law of the state of Kansas, in such case made and provided, the plaintiff herein is entitled to maintain this action and demand against the defendant, and she may enforce the same not only in the courts of the Indian Territory but in the courts of the state of Kansas as well, and such enforcement in the courts of the state of Kansas would be beneficial to the plaintiff and in no manner contravenes the policy of the state of Kansas, and is not against good morals—the laws of said territory in this regard being substantially the same as the laws of the state of Kansas, and not penal but remedial in character—as will more fully and at large appear by referring to said laws of said territory."

Plaintiff in error's position is: (1) That having alleged that she might have maintained this action in the Indian Territory it was incumbent upon defendant in error to prove what the courts there would hold in such a case; (2) that when congress adopted for the territory chapter 20 of Mansfield's digest of the Arkansas statutes it did not adopt the construction of the common law as declared by the supreme court of Arkansas, but that, in order to determine what the common law of the Indian Territory is, we must look to the decisions of the United States courts for the eighth circuit, which have jurisdiction there. In the principal case cited by the plaintiff in error (*St. Louis & S. F. R. Co. v. Arnett*, 84 S. W. 599, 600) the exact contrary was held by the Texas civil court of appeals with respect to the effect

Railroad Co. v. Johnson.

of the act of congress of May 2, 1890. The court there said:

"Such putting in force in the Indian Territory of the common law as then existing in Arkansas carried with it the construction theretofore placed thereon by the courts. of that state."

It was also said in the opinion that the uncontradicted evidence in that case "shows that in that state [Arkansas], prior to May 20, 1890, the question of fellow servant is determined exclusively by the character of the act intrusted to the person, rather than the rank of the employee." If it were necessary to determine in this case what the common law of the Indian Territory is upon the question of fellow servants, this court, in the absence of evidence, would assume it to be the same as that of Kansas. (*St. L. & S. F. Rly. Co. v. Weaver,* 35 Kan. 412, 11 Pac. 408, 57 Am. Rep. 176.) Was it necessary for plaintiff to prove what the common law of the Indian Territory was at the time the accident happened, or what the courts of that territory would hold if this action were tried there?

. The whole force of both contentions of plaintiff in error rests upon the assumption that the evidence in the case establishes that the only negligence for which the railroad company could in any event be held liable is the negligence of fellow servants of the deceased. In other words, that the death was caused by the negligence of the inspectors, who, it is claimed, under the laws of the Indian Territory were fellow servants of deceased. Plaintiff in error says:

"The most that can be said from the evidence is that the inspectors at Sapulpa or Francis failed to do their duty, either to inspect the car thoroughly for such a defect or to mark the same as in bad order."

The assumption that this is all the negligence shown is, we think, unwarranted. The railroad company offered no evidence that the car was ever inspected; so far as the evidence shows, it never was. The defect

was an obvious one which the most casual inspection would have disclosed. The jury therefore rightfully inferred that the car was put into the train without inspection. (*Mo. Pac. Rly. Co. v. Barber,* 44 Kan. 612, 24 Pac. 969.) The railroad company was charged in the petition with negligence in not having the car inspected and in putting it into the train for the employees to use in its dangerous and defective condition. Its duty required it to use reasonable diligence to provide the employees with reasonably safe appliances for the performance of their duties. (*Railroad Co. v. Penfold,* 57 Kan. 148, 45 Pac. 574; *Mo. Pac. Rly. Co. v. Dwyer,* 36 Kan. 58, 12 Pac. 352.) The doctrine of assumed risk has no application. In the absence of notice deceased had the right to assume that the car and its appliances were reasonably safe. (*Mo. Pac. Rly. Co. v. Barber, supra; A. T. & S. F. Rld. Co. v. Seeley,* 54 Kan. 21, 37 Pac. 104; *Railroad Co. v. Penfold, supra; Railway Co. v. Michaels,* 57 Kan. 474, 46 Pac. 938; *Railway Co. v. Bancord,* 66 Kan. 81, 71 Pac. 253.) It has been repeatedly declared to be the duty of the railroad company to inspect its cars before putting them in service. (*Solomon Rld. Co. v. Jones,* 30 Kan. 601, 2 Pac. 657; *St. L. & S. F. Rly. Co. v. Weaver,* 35 Kan. 412, 11 Pac. 408, 57 Am. Rep. 176; *A. T. & S. F. Rld. Co. v. Napole,* 55 Kan. 401, 40 Pac. 669; *A. T. & S. F. Rld. Co. v. Wagner,* 33 Kan. 660, 7 Pac. 204.)

What the courts of the Indian Territory would hold in a case where the only negligence shown is the act of a fellow servant is therefore wholly immaterial. The same question was decided in *A. T. & S. F. Rld. Co. v. Lannigan,* 56 Kan. 109, 42 Pac. 343. In that case the injury occurred in Missouri, at a time when the common-law rule in force in that state relieved the master from liability for the negligent act of a fellow servant. The proximate cause of the injury, however, was the failure of the railroad company to furnish the employee with a suitable lantern, and this court held that the fact that a fellow servant of the plaintiff was

Railroad Co. v. Johnson.

also guilty of negligence which contributed to the injury did not necessarily prevent plaintiff from recovering. In *A. T. & S. F. Rld. Co. v. Moore,* 29 Kan. 632, a judgment against the company was reversed because the trial court refused to instruct that under the common law in force in Texas, where the injury occurred, plaintiff could not recover for an injury caused by the negligence of a fellow servant. On a second trial plaintiff recovered again, and, in 31 Kan. 197, 1 Pac. 644, the judgment was affirmed upon the ground that the evidence showed that the injury was caused by the culpable negligence of the road-master, whose duty it was to direct repairs and keep the road in a safe condition, and that even under the rule of the common law the company was liable.

It was not necessary for plaintiff to prove a conclusion of law. When she established that the action here was one which under the laws of the Indian Territory survived, that the laws of descents and distributions there permitted plaintiff to maintain the action, and that the death was caused by the negligence of the railroad company in putting the defective car into the train, this court assumes, as a matter of law, that the holding of the courts there would be the same as that of the courts here.

The next serious contention is that there was no proof connecting the death of the deceased with any negligence of defendant. Plaintiff in error suggests a number of ingenious theories, any one of which might, if true, account for the death of brakeman Johnson, and the claim is made that in the absence of direct evidence showing the exact manner in which he fell the jury could not rightfully find that his fall was caused by the defective grab-iron· on the end of the car. They urge that he might inadvertently have walked off the end of the box car, or fallen in attempting to slide down the brake-staff, but these are purely speculative possibilities, rendered improbable by the fact that he was proved to have been a capable, ex-.

perienced, intelligent brakeman and that the ordinary and usual manner in which he would have gone from the box car to the flat car was down the ladder and around the end of the box car, resting his feet upon the grab-iron, as well as by the fact shown in evidence that if he had walked off the end of the car he would have fallen upon the flat car. The evidence, it is true, is largely circumstantial, but the exact place where he fell is clearly established by the blood marks on the trucks of the car. He was seen going over this car to the head of the train in the performance of his duties. His lantern was seen to fall suddenly to the ground. Something caused him to fall. The court rightfully told the jury that he was presumed to have been exercising ordinary care to preserve his life and his person from injury. If it had been the missing grab-iron at the top of the car which caused him to fall he naturally would have fallen at the side of the train, and this would not have accounted for the presence of his body between the rails. There was, then, some evidence to warrant the jury in finding that his fall was occasioned by the defective grab-iron between the cars. "A charge of negligence, like any other fact, may be established by circumstances as well as by positive testimony." (*A. T. & S. F. Rld. Co. v. Brassfield,* 51 Kan. 167, 174, 32 Pac. 814. See, also, *Railroad Co. v. Perry,* 65 Kan. 792, 70 Pac. 876.)

It is urged that there was no evidence of the length of time the defect existed; that the grab-iron on the end of the car might have been mashed in by coming in contact with the load of rails on the flat car after the train was made up. Defendant in error met this theory by proof that the load on the flat car was so far below the grab-iron that the latter could not have become mashed in that way, leaving the inference that its condition must have been the same when it was placed in the train, and the jury so found.

It is also claimed that deceased had knowledge of the defective condition of the car, and therefore was

guilty of contributory negligence. The conductor testified that at one of the stations north of where the accident occurred deceased told him there was a defective car in the train and that it had a missing handhold which came near letting him down, but this referred only to the missing grab-iron at the top of the car at the south. The jury found specially that it was the defective condition of the grab-iron mashed flat against the end of the car which caused deceased to fall. There is nothing in the conductor's evidence showing any knowledge of the defect which caused the death.

Complaint is made because the court admitted the testimony of a brakeman with reference to the usual and proper method of going from a box car to a flat car under the conditions and circumstances in which deceased was placed. This was not error. Similar testimony was held to be competent in *Railway Co. v. Merrill,* 61 Kan. 671, 60 Pac. 819.

There was no error in admitting proof that the defective condition of the car was repaired immediately after the accident. (*St. L. & S. F. Rly. Co. v. Weaver,* 35 Kan. 412, 11 Pac. 408, 57 Am. Rep. 176; *City of Abilene v. Hendricks,* 36 Kan. 196, 13 Pac. 121; *A. T. & S. F. Rld. Co. v. McKee,* 37 Kan. 592, 15 Pac. 484.)

The court gave the following instruction: "The burden is on the defendant to prove by a preponderance of the evidence the affirmative allegations of its answer." Defendant had alleged in its answer the defense of contributory negligence, and it is contended that under the authority of the case of *Railway Co. v. Merrill,* *supra,* this instruction was error. It is urged that the most of the evidence bearing upon contributory negligence came from plaintiff's witness, Gardner, the rear brakeman. The fact is, however, he gave no testimony tending to show contributory negligence of the deceased. He did not know what the deceased was doing at the time the accident occurred, except that he saw him going over the cars. We presume counsel claim that in his answer to a number of hypothetical

questions as to the probable consequences of a brake-
man's attempting to make a descent between the box
car in question and the flat car ahead of it by going
down the brake-staff some evidence of contributory
negligence entered the case, but there was no evidence
that deceased attempted to cross over in such a man-
ner. In the Merrill case the person injured was a wit-
ness and testified to his own acts at the time he was
injured, and that was the only testimony from which
his contributory negligence could have been shown.
The doctrine in that case, we think, should not be ex-
tended; certainly not to a case where there is no testi-
mony introduced by plaintiff tending to show contribu-
tory negligence. Plaintiff in error could not have been
in any manner prejudiced by this instruction, if it be
conceded to be as objectionable as the one in the Mer-
rill case. The other objections to the instructions have
been examined, but we find nothing which is deemed
prejudicial to the plaintiff in error.

At the close of the evidence counsel for plaintiff
waived the opening argument. Defendant thereupon
contended that by waiving the opening argument coun-
sel also waived the right to make a closing argument,
and upon the court's permitting counsel for plaintiff to
reply to the argument of defendant an exception was
saved, and it is claimed that the court erred. (*Railroad
Co. v. Vanzego,* 71 Kan. 427, 80 Pac. 944.) Defendant
had the right to submit the case to the jury without
argument when plaintiff waived the opening statement,
but, having elected to argue the case to the jury, was
not in a position to object to plaintiff's closing the ar-
gument by a reply. The party on whom rests the bur-
den of proof has the right to open and close the ar-
gument; he can waive either of these, or both. By
waiving the opening he waives the right to close, pro-
vided the other party also waives his argument. This
is the orderly method of procedure universally adopted
by the courts. The case cited does not go to the extent
claimed for it by the plaintiff in error.

Byrnes v. Deere.

Other errors are complained of which we do not consider material or of sufficient weight to require mention. We find no substantial errors in the record, and the judgment is affirmed.

All the Justices concurring.